UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| ERIC F.,<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of the Social Security Administration,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS**<br><br>Case No. 2:25-cv-00693<br><br>Magistrate Judge Daphne A. Oberg |

Eric F.[1] brought this action for judicial review of the denial of his application for disability insurance benefits and supplemental security income.[2] The administrative law judge (ALJ) who addressed Mr. F.'s application determined he did not qualify as disabled.[3] Mr. F. argues the ALJ erred by failing to properly consider his carpel tunnel syndrome and fifth digit amputation.[4] He also argues the ALJ erred by failing to account for residual functional capacity limitations that were more consistent with sedentary work.[5] As explained below, the ALJ adequately considered Mr. F.'s carpel tunnel

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in court orders in certain cases, including social security cases, the plaintiff is referred to by first name and last initial only.

[2] (Compl., Doc. No. 1.)

[3] (Certified Tr. of Admin. R. (Tr.) 17–28, Doc. No. 10.)

[4] (*See* Opening Br. 10, Doc. No. 18.)

[5] (*Id.*)

syndrome, fifth digit amputation, and related limitations, and substantial evidence supports the ALJ's residual functional capacity assessment. Accordingly, the Commissioner's decision is affirmed.[6]

## STANDARD OF REVIEW

Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code provide for judicial review of the Commissioner's final decision. This court reviews the ALJ's decision to determine whether substantial evidence supports his factual findings and whether he applied the correct legal standards.[7] "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."[8]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[9] Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla."[10] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11] "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an

---

[6] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. No. 9.)

[7] *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[8] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation omitted).

[9] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[10] *Id.* at 103 (citation omitted).

[11] *Id.* (citation omitted).

administrative agency's findings from being supported by substantial evidence."[12] And the court may not reweigh the evidence or substitute its judgment for that of the ALJ.[13]

**APPLICABLE LAW**

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[14] An individual is considered disabled only if his impairments are so severe, he cannot perform his past work or "any other kind of substantial gainful work."[15]

To determine if a claimant qualifies as disabled, the ALJ uses a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;
2) he has a severe medically determinable physical or mental impairment;
3) the impairment is equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation);
4) he has the residual functional capacity to perform past relevant work; and

[12] *Lax*, 489 F.3d at 1084 (citation omitted).

[13] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

[14] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[15] *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

5) he has the residual functional capacity to perform other work, considering his age, education, and work experience.[16]

In the first four steps, the claimant has the burden of establishing disability.[17] But at step five, the Commissioner must show the claimant retains the ability to perform other work in the national economy.[18]

**PROCEDURAL HISTORY**

Mr. F. applied for disability insurance benefits and supplemental security income, claiming he became disabled after a car accident in October 2020.[19] After an administrative hearing,[20] the ALJ issued a decision, finding Mr. F. not disabled and denying benefits.[21]

At step two of the sequential evaluation, the ALJ found Mr. F. had one severe impairment: "disorder of the skeletal spine."[22] The ALJ determined Mr. F. also had nonsevere impairments: "amputation of the tip of the fifth distal digit (little finger)," "degenerative joint disease of the bilateral knees," "depressive/bipolar related

---

[16] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).

[17] *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).

[18] *Id.*

[19] (*See* Tr. 17, 23, 188–201.)

[20] (Tr. 33–73.)

[21] (Tr. 17–28.)

[22] (Tr. 19.)

disorders," and substance use disorder.[23] At step three, the ALJ concluded Mr. F.'s impairments did not meet or medically equal an impairment listing.[24]

The ALJ then found Mr. F. had the residual functional capacity (RFC) to perform "light work" with certain limitations:

> He can lift or carry up to 20 pounds occasionally and up to 10 pounds frequently. He can stand or walk up to six hours in an eight-hour workday (with normal breaks) and can sit up to six hours in an eight-hour workday (with normal breaks). He can never climb ropes or scaffolds and can occasionally climb ladders, ramps, or stairs. He can frequently stoop, kneel, crouch, and crawl. He can frequently reach to the front and side and is limited to occasional overhead reaching. He can have no more than occasional concentrated exposure to extreme cold, unprotected heights, and unprotected moving machinery.[25]

At step four, based on this RFC and a vocational expert's testimony, the ALJ found Mr. F. unable to perform past work.[26] But at step five, the ALJ found Mr. F. capable of other jobs in the national economy.[27] Accordingly, the ALJ found Mr. F. not disabled and denied his claims.[28] This decision became final when the Appeals Council denied Mr. F.'s request for review.[29]

---

[23] (Tr. 20.)

[24] (Tr. 21–22.)

[25] (Tr. 22.)

[26] (Tr. 25–26.)

[27] (Tr. 26–28.)

[28] (Tr. 28.)

[29] (Tr. 1–3.)

## DISCUSSION

Mr. F. raises two broad claims of error. First, he argues the ALJ failed to properly consider his carpal tunnel syndrome and fifth digit amputation at step two of the sequential evaluation and in the RFC determination.[30] Second, he argues the ALJ erred in the RFC assessment in various ways, including by finding him capable of light work, rather than sedentary work, and by omitting greater manipulative limitations.[31] As explained below, Mr. F. has not shown any error requiring remand.

### A. The ALJ Adequately Considered Mr. F.'s Carpal Tunnel Syndrome and Fifth Digit Amputation

Mr. F. argues the ALJ erred by failing to acknowledge carpal tunnel syndrome as a medically determinable impairment at step two.[32] And he contends the ALJ failed to consider the combined limiting effects of his carpal tunnel syndrome and fifth digit partial amputation in assessing his RFC.[33]

"Unlike an error in determining an impairment's severity at step two, which is not reversible if the ALJ proceeds further to evaluate other impairments, a failure to find an impairment medically determinable" is generally not harmless error.[34] This is because

[30] (Opening Br. 10, 12–14, Doc. No. 18.)

[31] (*Id.* at 10, 14–20.)

[32] (*Id.* at 13.)

[33] (*Id.* at 13–14.)

[34] *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016) (unpublished) (citation omitted).

"the ALJ is only required to consider medically determinable impairments in the RFC."[35] "But even then, such error would be obviated if the ALJ considered the non-medically determinable impairment in assessing the RFC."[36]

Here, the ALJ did not mention carpal tunnel syndrome at step two or identify it as a medically determinable impairment.[37] This is despite record evidence showing Mr. F. was diagnosed with carpal tunnel syndrome based on medical testing (an EMG study) during the relevant period.[38] However, any error in failing to acknowledge this impairment at step two is harmless because the ALJ adequately considered it in assessing Mr. F.'s RFC.[39]

Mr. F.'s claim that the ALJ failed to acknowledge his carpal tunnel diagnosis from the EMG study in the RFC analysis[40] is incorrect. The ALJ specifically referenced and discussed it. The record of the EMG study results noted "electrodiagnostic evidence of a moderate right median mononeuropathy across the wrist (moderate right carpal tunnel

---

35 *Id.*

36 *Id.*

37 (*See* Tr. 19–21.)

38 (Tr. 366, 546 (duplicate records).)

39 Although Mr. F. generally mentions severity in an argument heading, (Opening Br. 12, Doc. No. 18), he does not specifically argue the ALJ erred by finding his fifth digit amputation nonsevere. (*See id.* at 13–14.) Regardless, such an argument would be unavailing, because failure to find an impairment severe at step two is harmless so long as the ALJ finds at least one severe impairment and proceeds through the remaining steps. *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016). The ALJ did so here.

40 (Opening Br. 13, Doc. No. 18.)

syndrome)."[41] In his RFC analysis, the ALJ acknowledged "there was an EMG/NCS . . . with mild right median neuropathy across the wrist" (i.e., carpal tunnel syndrome).[42] In other words, the record shows the ALJ considered this diagnosis—although he misstated the severity as "mild" rather than "moderate."[43] Mr. F.'s claim that the ALJ ignored this impairment in assessing RFC is simply incorrect.

The remainder of the ALJ's analysis shows he adequately considered the effects of Mr. F.'s carpal tunnel syndrome and fifth digit amputation. Immediately after referencing the carpal tunnel diagnosis, the ALJ noted Mr. F. had "undergone conservative treatment for [his] impairments, including pain medications, physical therapy, and multiple pain management injections."[44] The ALJ also discussed examination records showing Mr. F.'s "left and right wrist were able to bear weight, rotate, flex, and extend," and he had "intact" sensation and coordination.[45] And the ALJ acknowledged Mr. F. "reported numbness sensations" for which a provider recommended "daily exercise and medications"—although Mr. F. was not taking the

---

[41] (Tr. 366, 546.)

[42] (Tr. 24.)

[43] (*Id.*) Mr. F. does not argue the ALJ's misstatement amounts to harmful error. (He focuses instead on his erroneous claim that the ALJ did not reference the carpel tunnel diagnosis at all.) Where the ALJ's discussion of the evidence relating to carpal tunnel syndrome and its resulting limitations is otherwise accurate, this minor misstatement does not require reversal.

[44] (*Id.*)

[45] (Tr. 23 (citing Tr. 516–17, 635).)

medications regularly.[46] Elsewhere in the decision, the ALJ noted Mr. F. did "not allege, and the objective record [did] not establish, any significant functional loss from the amputation of the tip of the digit."[47] The ALJ then concluded Mr. F. was "limited in his ability to reach overhead, to the front, and to the side" due to limited range of motion, and included those limitations in the RFC assessment—but omitted other manipulative limitations.[48]

In sum, the ALJ expressly acknowledged Mr. F.'s carpal tunnel diagnosis and his fifth digit amputation. The ALJ also discussed medical evidence relating to Mr. F.'s treatment for carpal tunnel syndrome, reported symptoms, and manipulative abilities in the RFC analysis. This record shows the ALJ adequately considered Mr. F.'s carpal tunnel impairment, fifth digit amputation, and resulting limitations in assessing his RFC. Accordingly, any error in failing to mention carpal tunnel syndrome at step two was harmless.

B. Substantial Evidence Supports the RFC Assessment

Mr. F. next challenges the RFC assessment, claiming the ALJ should have limited him to sedentary work with greater manipulative limitations.[49] Mr. F. raises a number of specific complaints, arguing the ALJ cherry-picked medical evidence, ignored

---

[46] (*Id.* (citing Tr. 516–17).)

[47] (Tr. 20.)

[48] (Tr. 22, 24.)

[49] (Opening Br. 14, Doc. No. 18.)

treating providers' opinions, mischaracterized his treatment as conservative, improperly rejected prior administrative findings, and relied on his own lay interpretation of medical data. As explained below, because the ALJ applied the correct legal standards and substantial evidence supports the RFC assessment, Mr. F. has not shown error.

*1. Applicable Law*

A claimant's RFC reflects the most he can do in a work setting considering his limitations.[50] In assessing RFC, the ALJ considers "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."[51] The ALJ considers all relevant evidence in the record.[52] "[A]lthough an ALJ is entitled to resolve conflicts in the record, [he] may not pick and choose among medical reports, using portions of evidence favorable to [his] position while ignoring other evidence, or mischaracterize or downplay evidence to support [his] findings."[53]

An ALJ is not required to discuss every piece of evidence, so long as the record shows he considered all the evidence.[54] "[I]n addition to discussing the evidence

---

[50] *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, 1996 SSR LEXIS 5, at *1–2 (July 2, 1996).

[51] SSR 96-8p, 1996 SSR LEXIS 5, at *5.

[52] *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

[53] *Bryant v. Comm'r*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) (citations and internal quotation marks omitted) (describing this is as "impermissible cherry-picking").

[54] *See Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).

supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."[55] The ALJ must also evaluate the persuasiveness of medical opinions and prior administrative medical findings—and explain how he considers the supportability and consistency of opinion evidence.[56]

*2. ALJ Decision*

The ALJ acknowledged Mr. F. was in a car accident in October 2020 which caused a cervical spinal cord injury.[57] He considered Mr. F.'s reported symptoms of ongoing pain, weakness, fatigue, and limited range of motion.[58] But the ALJ found Mr. F.'s statements about the "intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence."[59]

Reviewing the medical evidence, the ALJ noted Mr. F. could walk one day after the accident.[60] Later treatment records showed Mr. F. had "5/5 strength throughout, though he had 3+ reflexes bilaterally throughout."[61] He also had "intact sensation,

---

[55] *Id.* at 1010.

[56] 20 C.F.R. §§ 404.1520c, 416.920c.

[57] (Tr. 23.)

[58] (*Id.*)

[59] (*Id.*)

[60] (*Id.*)

[61] (*Id.*)

coordination, station, and gait."[62] The ALJ noted straight leg raise tests were sometimes positive (indicating pain) and sometimes negative.[63] Examination records showed Mr. F.'s wrists could "bear weight, rotate, flex, and extend," and he had "no restrictions to range of motion with the back and was able to get up and down from sitting without assistance and to bend over and get up without assistance."[64] The ALJ also discussed imaging records including MRIs, a CT scan, and an EMG/NCS.[65] This included findings of "abnormal signal and loss of cord volume," "[m]oderate to severe multilevel cervical disc generation," "[s]evere neuroforaminal stenosis," "moderate spinal canal stenosis," and "no acute cervical spine fracture or traumatic misalignment" (among others).[66]

The ALJ found Mr. F. had "undergone conservative treatment" for his impairments, including "pain medications, physical therapy, and multiple pain management injections."[67] The ALJ also considered Mr. F.'s daily activities, finding his ability to manage finances, pay bills, go shopping, go out unaccompanied, and prepare simple meals "not entirely consistent" with his alleged limitations.[68]

---

[62] (*Id.*)

[63] (*Id.*)

[64] (*Id.*)

[65] (Tr. 23–24.)

[66] (*Id.*)

[67] (Tr. 24.)

[68] (*Id.*)

The ALJ then considered the state agency medical consultants' prior administrative findings.[69] On initial review and reconsideration, these consultants found Mr. F. capable of sedentary work, with limitations in postural activities, reaching, and exposure to conditions including hazards, cold, and vibration.[70] The ALJ found these prior findings unpersuasive.[71] While acknowledging the findings were supported by the evidence available to the consultants, the ALJ noted they did not have a treating or examining relationship with Mr. F., they did not review the complete medical evidence, and they did not observe Mr. F. at the hearing or listen to his testimony.[72] The ALJ concluded the overall record supported fewer exertional restrictions.

Specifically, the ALJ concluded Mr. F. had the RFC to perform light work with additional limitations.[73] He explained that "because of limited range of motion in the upper extremities," Mr. F. was "limited in his ability to reach overhead, to the front, and to the side."[74] And "[b]ecause of fatigue and weakness," he was "limited in his ability to

[69] (Tr. 24–25.)

[70] (*See id.*)

[71] (*Id.*)

[72] (*Id.*)

[73] (Tr. 22.)

[74] (Tr. 24.)

tolerate cold and hazards."[75] But the ALJ found the record did not support a more restrictive RFC.[76]

*3. Analysis*

a. Cherry-Picking

Mr. F. first argues the ALJ improperly cherry-picked favorable evidence and ignored evidence showing greater limitations.[77] But this argument is not borne out by the record. Each individual complaint is addressed below.

- Mr. F. complains that the ALJ failed to mention he was hospitalized, experienced quadriparesis, and had surgery (anterior cervical discectomy and fusion) after the October 2020 car accident.[78] But in discussing the accident, the ALJ specifically cited Mr. F.'s hospital discharge record following the surgery.[79] The ALJ also expressly referenced Mr. F.'s "ACDF" (i.e., anterior cervical discectomy and fusion surgery) in discussing an MRI record.[80] And the ALJ asked Mr. F. about his neck surgery at the hearing.[81] Thus, the

[75] (*Id.*)

[76] (Tr. 25.)

[77] (Opening Br. 16–19, Doc. No. 18.)

[78] (*Id.* at 16–17.)

[79] (Tr. 23 (citing 417).) The discharge record refers to the anterior cervical discectomy and fusion surgery as "ACDF." (Tr. 417.)

[80] (Tr. 23.)

[81] (Tr. 56.)

record shows the ALJ considered the surgery. Further, hospital treatment records indicate Mr. F.'s quadriparesis lasted only twenty to thirty minutes for his lower extremities and improved overnight for his upper extremities.[82] Mr. F. has not shown this temporary condition is significantly probative such that the ALJ needed to discuss it.

- Mr. F. acknowledges the ALJ referenced some imaging results but complains that he failed to mention others, including X-rays from January, May, and October 2021 and September 2023, and a November 2023 MRI.[83] But Mr. F. does not explain how these results differ from the imaging the ALJ discussed or how they support greater RFC limitations. Mr. F. also asserts some of these imaging studies prompted steroid injections and nerve block injections, but the ALJ expressly acknowledged these treatments.[84]
- Mr. F. reiterates his incorrect contention that the ALJ ignored his carpal tunnel diagnosis.[85] As explained above, the ALJ expressly acknowledged it.[86]

[82] (Tr. 428.)

[83] (Opening Br. 17, Doc. No. 18.)

[84] (*See* Tr. 24 (stating Mr. F. had received "multiple pain management injections").

[85] (Opening Br. 17, Doc. No. 18.)

[86] (*See* Tr. 24 (stating "there was an EMG/NCS . . . with mild right median neuropathy across the wrist" (i.e., carpal tunnel syndrome)).)

- Mr. F. contends the ALJ "left out that 3+ reflexes signified abnormal hyperflexia."[87] But the ALJ expressly acknowledged this examination result.[88] And Mr. F. has not shown more in-depth discussion was required.
- Mr. F. contends the ALJ ignored unfavorable examination findings, including upper extremity weakness, numbness, and tingling; decreased ranges of motions in all planes; spasticity; and decreased sensation.[89] But the ALJ specifically acknowledged Mr. F.'s limited range of motion and his reported fatigue and weakness, and he included limitations in the RFC to account for these symptoms.[90] The ALJ also discussed and cited medical records documenting Mr. F.'s reports of "numbness sensations."[91] Under these circumstances, Mr. F. has not shown the additional examination records he cites are significantly probative, and the ALJ was not required to discuss them.

---

[87] (Opening Br. 17, Doc. No. 18.)

[88] (*See* Tr. 23 (stating "treatment indicated 5/5 strength throughout, though he had 3+ reflexes bilaterally throughout").)

[89] (Opening Br. 17, Doc. No. 18.)

[90] (*See* Tr. 24 ("Because of ongoing pain and limited range of motion, the claimant is limited in his ability to perform exertional and postural activities. Because of limited range of motion in the upper extremities, he is limited in his ability to reach overhead, to the front, and to the side. Because of fatigue and weakness, the claimant is limited in his ability to tolerate cold and hazards.").

[91] (Tr. 23 (citing Tr. 516–17).)

In sum, Mr. F. has not shown the ALJ mischaracterized the medical evidence or engaged in impermissible cherry-picking. While Mr. F. identifies some evidence the ALJ did not specifically discuss, he has not established this evidence was significantly probative; accordingly, the ALJ was not required to discuss it. Overall, the record shows the ALJ accurately summarized the medical evidence and adequately explained the basis for his RFC findings.

b. Statements from Treating Providers

Mr. F. also contends the ALJ failed to discuss "opinions" from treating providers (Dr. MacFarlane and Dr. Hunter).[92] Specifically, he references:

- Dr. MacFarlane's statement that Mr. F.'s continued neuropathy was likely due to the severity of his cord compression before surgery;[93]
- Dr. MacFarlane's recommendation that, while recovering from surgery, he should limit lifting to "15 pounds for the next 2 months" and "start out doing half days and work up to 8-hour shifts";[94]
- Dr. McFarlane's recommendation of surgical intervention if conservative treatment did not improve his pain;[95] and

[92] (Opening Br. 18, Doc. No. 18.)

[93] (Tr. 561.)

[94] (Tr. 400.)

[95] (Tr. 385, 400, 561.)

- Dr. Hunter's statement that Mr. F.'s symptoms resulted from his spinal cord injury.[96]

None of this qualifies as medical opinion evidence under agency regulations. The regulations define "medical opinion" narrowly as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in certain enumerated work-related abilities.[97] The regulations distinguish this from "objective medical evidence," defined as "medical signs, laboratory findings, or both,"[98] and "other medical evidence," which includes "judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."[99] The evidence Mr. F. cites from Dr. McFarlane and Dr. Hunter fall into the latter category. Even Dr. McFarlane's recommended lifting restrictions were short term and related to Mr. F.'s recovery from surgery; he did not opine on Mr. F.'s impairment-related limitations generally. Accordingly, the ALJ was not required to discuss this evidence or assess its persuasiveness, as required for medical opinions.

---

[96] (Tr. 516–17, 621.)

[97] 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

[98] *Id.* §§ 404.1513(a)(1), 416.913(a)(1).

[99] *Id.* §§ 404.1513(a)(3), 416.913(a)(3).

c. Conservative Treatment

Mr. F. contends the ALJ mischaracterized his treatment as conservative and "arbitrarily" discounted the credibility of his subjective complaints based on this mischaracterization.[100] Mr. F. has not shown error.

Under the governing regulations, the type of treatment a claimant receives is among the factors an ALJ should consider in evaluating his subjective symptoms.[101] As agency guidance explains, "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," the ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."[102] Accordingly, the ALJ permissibly considered the nature of Mr. F.'s treatment in evaluating his reported symptoms.

Further, substantial evidence supports the ALJ's characterization of Mr. F.'s treatment as conservative. Mr. F. points to his neck surgery, fifth digit surgery and

---

[100] (Opening Br. 18–19, Doc. No. 18.) Mr. F. uses the term "credibility" in arguing this issue, (*see id.* at 15, 18), but this term is no longer used in agency policy to describe subjective symptom evaluation. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *1 (Mar. 16, 2016). Despite his use of this term, Mr. F. also cites the current agency policy governing subjective symptom evaluation. (*See* Opening Br. 15, Doc. No 18 (citing SSR 16-3p).) Accordingly, the court construes Mr. F.'s brief as arguing the ALJ erred under current agency policy.

[101] *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)–(v), 416.929(c)(3)(iv)–(v) (listing factors, including "(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" and "(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms").

[102] SSR 16-3p, 2016 SSR LEXIS 4, at *23.

partial amputation, steroid and nerve block injections, and use of medical marijuana for pain as evidence refuting the ALJ's characterization.[103] But the ALJ accurately noted Mr. F. did not allege "any significant functional loss" from his fifth digit surgeries or amputation."[104] And Mr. F.'s neck surgery occurred immediately after the October 2020 car accident that he claimed rendered him disabled. As the ALJ accurately noted, for the remainder of the relevant period, Mr. F. was treated only with "pain medications, physical therapy, and multiple pain management injections," despite alleging ongoing disabling symptoms.[105] The ALJ reasonably described these treatments as conservative, and Mr. F. cites no authority to the contrary. Indeed, many cases reference pain injections as conservative in nature.[106] Likewise, non-narcotic pain medications and physical therapy are commonly described as conservative treatments.[107] The only medication Mr. F. identifies to support his argument is medical

---

[103] (Opening Br. 19, Doc. No. 18.)

[104] (Tr. 20; *see also* Tr. 46–47 (Mr. F.'s hearing testimony regarding the amputation).)

[105] (Tr. 24.)

[106] *See, e.g.*, *Barnhill-Stemley v. Colvin*, 607 F. App'x 811, 815 (10th Cir. 2015) (unpublished) (noting a physician's record characterizing injections for pain as conservative treatment); *McManus v. O'Malley*, No. CIV-23-354, 2024 U.S. Dist. LEXIS 70865, at *13–14 (W.D. Okla. Apr. 18, 2024) (unpublished) (collecting cases characterizing pain injections as conservative treatment).

[107] *See, e.g.*, *Alarid v. Colvin*, 590 F. App'x 789, 794 (10th Cir. 2014) (unpublished) (upholding ALJ finding that treatment for back pain was conservative when involving medication and lumbar facet injections); *Stacey R. S. v. O'Malley*, No. 23-cv-00020, 2024 U.S. Dist. LEXIS 52154, at *10 (N.D. Okla. Mar. 25, 2024) (unpublished) (finding recommended treatment of physical therapy and non-narcotic pain medication was conservative); *Ryan v. Colvin*, No. CV 15-0740, 2016 U.S. Dist. LEXIS 141356, at *9

marijuana, and he cites no legal authority finding marijuana qualifies as non-conservative treatment.

For these reasons, the ALJ did not err in finding Mr. F.'s treatment was conservative, and he permissibly relied on this in concluding Mr. F. was not as limited as he alleged.

d. Prior Administrative Findings

Mr. F. next challenges the ALJ's rationale for rejecting the prior administrative findings, arguing the totality of the evidence was consistent with the consultants' findings that he was limited to sedentary work.[108] But this is merely an invitation to reweigh the evidence, which the court cannot do.[109] As set forth above, the ALJ relied on Mr. F.'s abilities on examination, his conservative treatment, and his daily activities in finding he was less limited than he alleged—and less limited than the consultants opined.[110] This evidence is more than a "mere scintilla."[111] It qualifies as substantial evidence supporting the ALJ's findings.

---

(D.N.M. Sept. 29, 2016) (unpublished) (finding recommended treatment of physical therapy, weight loss, and home exercise was conservative).

[108] (Opening Br. 19–20, Doc. No. 18.)

[109] *Langley*, 373 F.3d at 1118.

[110] (*See* Tr. 23–25.)

[111] *Biestek*, 587 U.S. at 103.

Mr. F. also argues the totality of the evidence supported greater manipulative limitations—specifically, significant handling, reaching, and fingering limitations.[112] This argument fails for the same reason: it is merely an invitation to reweigh the evidence. As described above, the record shows the ALJ adequately considered Mr. F.'s carpal tunnel syndrome and fifth digit amputation. And the evidence the ALJ discussed—including examination records showing Mr. F.'s "left and right wrist were able to bear weight, rotate, flex, and extend" and he had "intact" sensation and coordination[113]—qualifies as substantial evidence supporting his findings.

Finally, Mr. F. argues that by rejecting the prior administrative findings, the ALJ impermissibly "played doctor" in finding Mr. F. capable of light work.[114] But "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."[115] "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."[116] Accordingly, the ALJ did not err by determining Mr. F.'s RFC without crediting any medical opinions or prior administrative findings. And nothing in the ALJ's decision

---

[112] (Opening Br. 20, Doc. No. 18.)

[113] (Tr. 23 (citing Tr. 516–17, 635).)

[114] (Opening Br. 20, Doc. No. 18.)

[115] *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

[116] *Id.* (alteration in original) (citation omitted); *see also Young v. Barnhart*, 146 F. App'x 952, 955 (10th Cir. 2005) (unpublished) ("The determination of RFC is an administrative assessment, based upon all the evidence of how the claimant's impairments and related symptoms affect [his] ability to perform work-related activities." (citing SSR 96-8p, 1996 SSR LEXIS 5, at *5)).

suggests he engaged in improper lay interpretation of raw medical data. Rather, he relied on medical providers' observations and assessments.[117] It fell properly within the ALJ's role to determine Mr. F.'s RFC limitations based on the medical record.

* * *

For all these reasons, Mr. F. has not demonstrated error in the ALJ's RFC assessment. The ALJ applied the correct legal standards, and substantial evidence supports his RFC findings.

**CONCLUSION**

The Commissioner's decision is affirmed.

DATED this 22nd day of September, 2026.

BY THE COURT:

Daphne A. Oberg

Daphne A. Oberg
United States Magistrate Judge

---

[117] *See Neal v. Comm'r, Soc. Sec. Admin.*, 782 F. App'x 722, 724 (10th Cir. 2019) (unpublished) (finding an ALJ did not make an improper lay interpretation of medical evidence where the ALJ did not interpret raw medical data or step into the shoes of a medical examiner).